UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL P. TOMLIN,            )
                             )
            Plaintiff,        )
                             )
      v.                      )        No.  4:13CV2424 SPM
                             )
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security, )
                             )
            Defendant.        )

## MEMORANDUM AND ORDER

Plaintiff Michael P. Tomlin brings this action under 42 U.S.C. § 405(g) for

judicial review of the Commissioner's final decision denying his application for

disability insurance benefits (DIB) filed pursuant to Title II of the Social Security

Act, 42 U.S.C. §§ 401, *et seq.*  All matters are pending before the undersigned

United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C.

§ 636(c).  Because the Commissioner's final decision is supported by substantial

evidence on the record as a whole, it is affirmed.

### I.  Procedural History

On March 23, 2011, the Social Security Administration denied plaintiff's

March 7, 2011, application for DIB in which he claimed he became disabled on

April 15, 2010, because of chronic chostri, IgA nephropathy, reactive airway

disease, memory loss, joint pain, medications, back pain, and fatigue. (Tr. 54, 59-62, 111-12, 131.) Plaintiff subsequently amended his alleged onset date to September 17, 2010. (Tr. 127.) Upon reconsideration, the SSA continued to deny plaintiff's claim. (Tr. 56.) At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on August 13, 2012, at which plaintiff and a vocational expert testified. (Tr. 32-52.) On August 28, 2012, the ALJ denied plaintiff's claim for benefits, finding plaintiff able to perform other work as it exists in significant numbers in the national economy. (Tr. 11-28.) On September 27, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred in determining his residual functional capacity (RFC) by improperly evaluating the treatment records and by failing to include additional limitations in the RFC assessment. Plaintiff also contends that the ALJ erred in finding his subjective complaints not to be credible and by failing to accord sufficient weight to the opinion of his treating physician. Plaintiff also claims that the hypothetical question posed by the ALJ to the vocational expert did not include all of his limitations, including limitations as found by the ALJ in her written

decision, and thus that the ALJ erred in relying on the expert's response to find plaintiff not disabled. Plaintiff requests that the final decision be reversed and that the matter be remanded for an award of benefits or for further consideration. For the reasons that follow, the ALJ did not err in her determination.

## II. Testimonial Evidence Before the ALJ

A.    <u>Plaintiff's Testimony</u>

At the hearing on August 13, 2012, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was forty years of age.

Plaintiff stands six feet, six inches tall and weighs 320 pounds. (Tr. 41-42.) Plaintiff lives in a condominium with his mother. (Tr. 35, 47.) Plaintiff has an associate's degree and also received training as a truck driver. (Tr. 35.) Plaintiff served in the military from 1990 to 1993. (Tr. 142.)

Plaintiff's Work History Report shows that plaintiff worked as an over-the-road truck driver from February 2003 to December 2005. From December 2005 to May 2009, plaintiff worked as driver for a repossession company. From November 2009 to February 2010, plaintiff worked as a pizza maker for Imo's Pizza. From February to May 2010, plaintiff worked as a cabaret manager. In May 2010, plaintiff worked again doing car repossession. (Tr. 142.) Plaintiff testified that he also previously performed work as an architectural draftsman,

architectural engineer, telephone collection agent, and telephone salesperson. (Tr. 37-38.)

Plaintiff testified that he has degenerative disease in the spine at L4 and L5, which limits his ability to stand or sit for too long. Plaintiff testified that his back condition stopped him from continuing his job as a repossession officer because he could no longer crawl under vehicles to hook them up. Plaintiff testified that his inability to return to work is what prompted him to move back to St. Louis and receive care at the Veterans Administration (VA) hospital. (Tr. 41, 44.)

Plaintiff testified that he also has IgA nephropathy, known as Berger's disease. (Tr. 41.) Plaintiff testified that his kidneys currently function at forty-two percent and that he must start dialysis if the functioning decreases to thirty percent. Plaintiff testified that the disease makes it difficult to keep enough fluid in his system, making him susceptible to dehydration. Plaintiff testified that he was recently hospitalized for dehydration. Plaintiff must drink an "enormous amount" of fluids to keep up with his kidney function. Plaintiff testified that his kidney ailment puts additional strain on his lower back. Plaintiff testified that the kidney disease also causes extreme fatigue, and he must continually lie down for one to two hours after being up for one hour. Plaintiff cannot keep up with the fatigue, and he naps five or six times a day. (Tr. 42-43, 45.)

Plaintiff testified that he sees his doctors at least four times a month and

takes medication for his conditions.  Plaintiff testified that he experiences side effects from his medication, including drowsiness, night sweats, and nightmares. Plaintiff testified that the fatigue brought on by his medication adds to his general level of fatigue.  (Tr. 44, 48.)

As to his exertional abilities, plaintiff testified that he can walk about 200 to 300 feet at one time at a slow pace without becoming exhausted.  Plaintiff feels pressure on his spine after walking such a distance.  Plaintiff can stand in one place for about thirty to forty-five minutes.  He can sit for about forty-five minutes at one time.  Plaintiff testified that he can lift up to eighty pounds but only about twenty pounds without pain.  (Tr. 45-46.)

As to his daily activities, plaintiff testified that his mother makes him breakfast when he wakes up, after which he does the dishes.  Plaintiff testified that he takes his medication during breakfast and usually falls asleep about forty-five minutes later because of its effects.  Plaintiff testified that he watches television after waking up and then helps clean, eats lunch, and takes his second round of medication.  Plaintiff testified that he naps again for another hour or two, after which he watches television and then takes another nap before dinner.  Plaintiff takes his third round of medication with dinner, after which he naps until 8:00 or 9:00 p.m.  Plaintiff testified that he then helps his mother and does odds and ends around the house until he goes to bed.  Plaintiff sleeps about three or four hours at

night. (Tr. 46-47.) Plaintiff testified that he sometimes prepares his own meals but that his mother usually cooks. Plaintiff occasionally cleans the dishes. Plaintiff testified that he leaves his home for doctors' visits, but otherwise does not leave more than once a month. Plaintiff does not shop and is not involved in any volunteer organizations. (Tr. 47-48.)

Plaintiff smokes one-half pack of cigarettes a day. (Tr. 48.) Plaintiff last had a drink six months prior to the hearing. (Tr. 40.)

B.    Testimony of Vocational Expert

Delores Gonzalez, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Ms. Gonzalez classified plaintiff's past work as an architectural drafter and engineering drafter as sedentary and skilled; as a customer service representative and telemarketer as sedentary and semi-skilled; as a bill collector as light and semi-skilled; as a cabaret manager as light and skilled; and as a pizza maker, tractor-trailer truck driver, and tow truck/repossession driver as medium and semi-skilled. (Tr. 49-50.)

The ALJ asked Ms. Gonzalez to consider plaintiff to be limited to medium, unskilled work. Ms. Gonzalez testified that plaintiff could not perform any of his past relevant work but could perform other work such as motor vehicle assembler, of which 27,030 such jobs exist in the State of Missouri and 952,300 nationally;

farm/grain worker, of which 790 such jobs exist in the State of Missouri and 233,280 nationally; and trimmer, of which 4,515 such jobs exist in the State of Missouri and 186,948 nationally.  (Tr. 50-51.)

### III.  Medical Records Before the ALJ

Plaintiff visited the VA Medical Center on July 14, 2010, as a new patient with complaints of pain in his kidneys with no burning.  Plaintiff also complained of constant pain in his sternum.  Plaintiff reported that his bowels were regular, and he had no arthralgias.  It was noted that plaintiff had just moved from Phoenix.  Dr. Rama D. Bandi noted plaintiff's current conditions to include hypertension, obesity, hyperlipidemia, nephrolithiasis, bilateral flank pain, migraines, depression, lipoma, and hematuria.  Plaintiff was taking no medications.  Physical examination was unremarkable.  Depression screening yielded positive results.  A learning assessment showed plaintiff to be forgetful but that he had a good level of understanding.  Atenolol was prescribed for hypertension.  Plaintiff was advised to quit smoking.  Plaintiff declined to participate in a weight management program. Laboratory tests were ordered, and plaintiff was referred to Psychology for depression.  In response to alcohol screening, plaintiff reported that he had had one or two drinks once a month or less during the previous year.  (Tr. 450-56.)

Plaintiff visited the Psychology unit that same date for initial evaluation. Plaintiff reported having poor sleep and decreased interest.  It was noted that

plaintiff had been out of work for one and a half years. Plaintiff's energy and concentration were normal. Plaintiff denied any suicidal ideation. Plaintiff reported having vague feelings of anger and frustration. Plaintiff's mood was depressed and his affect edgy. Plaintiff's thought content was logical and concrete, and his judgment and insight were adequate. Plaintiff reported occasional alcohol use and denied ever drinking to excess. Plaintiff was referred to the Mental Health Clinic. (Tr. 449-50.)

Plaintiff visited Dr. Fred W. Gaskin in the Psychiatry unit at the VA on July 30, 2010. Plaintiff reported that he was an alcoholic and drank heavily until he was twenty-nine years of age and continued to drink until age thirty-six. Plaintiff reported that he had significantly decreased his drinking and had had maybe two beers in the past two months. Plaintiff reported being down and irritable and that he did not trust anyone. Plaintiff had a low mood with thoughts that he would be better off dead, but he was not suicidal. Plaintiff reported a twenty-year history of sleeping one or two hours at night. Plaintiff reported an increase in weight but no change in appetite. It was noted that plaintiff had gained twenty-four pounds within the previous month and currently weighed 308 pounds. Plaintiff reported having had various jobs and being unemployed for two months. Mental status examination showed plaintiff to be depressed and irritable. Plaintiff's memory and concentration were good, as well as his insight and judgment. Dr. Gaskin

diagnosed plaintiff with depression and assigned a Global Assessment of Functioning (GAF) score of 55.[1]  Bupropion was prescribed.  (Tr. 439-45.)

Plaintiff returned to Dr. Gaskin on August 27 and reported not feeling any different with the medication.  Plaintiff denied any medication side effects. Plaintiff was noted to be upset because he had not yet received any test results regarding his kidneys.  Plaintiff's blood pressure was elevated.  No edema was noted in the extremities.  Plaintiff reported having fair sleep.  Mental status examination showed plaintiff to be sullen and irritable but was otherwise normal. Plaintiff was instructed to increase Bupropion.  (Tr. 430-34.)

Plaintiff visited Dr. Michael I. Rauchman on September 17, 2010, for a nephrology consult.  Plaintiff reported having low back pain and a recent onset of lower abdominal pain.  Physical examination showed mild tenderness about the right lower quadrant.  No edema was noted.  Upon review of recent lab results and diagnostic testing, Dr. Rauchman diagnosed plaintiff with nephrotic range proteinuria with eGFR at a value demonstrating stage 3, or moderate, kidney damage[2] with clinical presentation that strongly suggested underlying

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* 34 (4th ed. 2000).  A GAF score between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

[2] The test for estimated Glomerular Filtration Rate (eGFR) is used to screen for and detect kidney damage.  *eGFR*, American Ass'n for Clinical Chemistry (last modified Apr. 3, 2014),

glomerulonephritis (GN) with IgA[3] "as a leading contender." Dr. Rauchman also diagnosed plaintiff with hypertension, possibly secondary to underlying GN, exacerbated by high salt intake, obesity, and progressive chronic kidney disease; and nephrolithiasis, likely idiopathic hypercalciuria. Lisinopril was added to plaintiff's medication regimen. Additional laboratory testing was ordered, and plaintiff was instructed to work with his primary care physician on smoking cessation and weight loss given the risk factors associated with chronic kidney disease. (Tr. 427-28.)

Results of a renal biopsy performed on September 29 confirmed IgA nephropathy. Dr. Rauchman noted about half of the glomeruli to be globally sclerosed with moderate tubular atrophy and interstitial fibrosis. Dr. Rauchman reported laboratory results to show a risk of progression, and he prepared a treatment regimen that included medication as well as instructions for plaintiff to attain good blood pressure control, lose weight, and stop smoking. Dr. Rauchman determined not to prescribe steroids because of concern regarding side effects and, further, because the biopsy showed chronic changes without a lot of potentially reversible inflammation. (Tr. 410-11.)

---

*available at* <http://labtestsonline.org/understanding/analytes/gfr/tab/test/>.

[3] IgA nephropathy (Berger's disease) occurs when too much of the IgA protein/antibody is deposited in the kidneys, leading to inflamed and damaged structures in the kidneys. *IgA nephropathy,* Medline Plus (last updated Nov. 7, 2014)<http://www.nlm.nih.gov/medlineplus/ency/article/000466.htm>.

Plaintiff returned to Dr. Gaskin on October 8, 2010, and reported no change in his mood and that he continued to be irritable. Plaintiff reported a decrease in his smoking in that he was down to three or four cigarettes a day. It was noted that plaintiff's sleep was good, and he had good concentration. No change was made to plaintiff's treatment regimen. (Tr. 406-10.)

Plaintiff visited Dr. Bandi on November 10, 2010, who noted plaintiff's recent diagnosis of kidney disease. Plaintiff complained of having chronic diarrhea for over fifteen years and that he currently had bowel movements three to six times a day. Plaintiff reported the episodes to occur as soon as he eats. Plaintiff reported smoking one pack of cigarettes a day and occasional use of alcohol. Plaintiff's current medications were noted to include Atenolol, Bupropion, Lisinopril, and Venlafaxine. Physical examination was unremarkable. Dr. Bandi determined plaintiff's hypertension to be stable. Plaintiff was instructed to continue with his medication and to return in six months. (Tr. 403-06.)

Plaintiff returned to Dr. Gaskin on November 22, 2010, and reported not much change and that he continued to have a low mood. Plaintiff reported that he was forced to be more active because his mother had surgery. Dr. Gaskin noted a slight weight gain and that plaintiff currently weighed 313 pounds, but that he was not grossly obese given that he was a "big guy." Plaintiff agreed to a clinical trial of Topamax for migraines as well as to the addition of an anticonvulsant to

decrease risk of seizure. Plaintiff's Bupropion and Venlafaxine were increased. Dr. Gaskin noted that such an increase may relieve some of plaintiff's gastrointestinal issues. Mental status examination showed plaintiff's mood and affect to be slightly brighter but was otherwise unchanged. (Tr. 399-403.)

On that same date, November 22, plaintiff visited Dr. Brian K. Dieckgraefe, a gastroenterologist, with complaints of chronic diarrhea and having five or six bowel movements each day during the previous six months with such episodes occurring about five minutes after eating. Plaintiff reported a history of being a severe alcoholic until age twenty-eight, but that he currently drank maybe one beer every six months. Plaintiff reported having abdominal and rectal pain with some dyspepsia, frequent reflux symptoms, dysphagia, and hematemesis. Physical examination was unremarkable. Diagnostic studies were ordered. (Tr. 395-99.)

During a follow up visit with Dr. Rauchman on November 23, plaintiff was encouraged to lose weight and stop smoking in order to reduce the risk of progression of his chronic kidney disease. Plaintiff was also encouraged to increase his fluid intake. (Tr. 394-95.)

An esophagogastroduodenoscopy performed on January 3, 2011, yielded positive findings for esophageal ulcers and gastropathy. A colonoscopy performed that same date yielded positive results for polyps and internal hemorrhoids. (Tr. 457-60, 460-63.) Imodium was prescribed for diarrhea. (Tr. 225.)

Plaintiff returned to Dr. Dieckgraefe on January 24, 2011, and reported his diarrhea to have resolved, possibly because of medication. Dr. Dieckgraefe opined that plaintiff may have irritable bowel syndrome. Physical examination was normal. Plaintiff weighed 321 pounds. Plaintiff was instructed to take Lopermide and Omeprazole for gastroesophageal reflux disease and esophageal ulceration. Plaintiff was instructed to return as needed. (Tr. 380-84.)

Plaintiff visited Dr. Gaskin that same date, January 24, and reported that he was more irritable and depressed after having run out of Venlafaxine one week prior. Plaintiff also reported sleeping better while taking Venlafaxine. Plaintiff was restarted on the medication and was also prescribed Abilify. Mental status examination showed plaintiff to be depressed and irritable but was otherwise normal. Plaintiff was assigned a GAF score of 55. (Tr. 376-80.) On February 23, plaintiff reported not being as irritable but that he was experiencing some shakiness. Plaintiff reported having no side effects from his medications. No tremors were noted during examination. Plaintiff reported his sleep to be okay. Plaintiff had lost weight. Plaintiff reported eating healthier but not exercising because of exhaustion. Dr. Gaskin noted that plaintiff was a bit irritable but was better than in the past. No change was made to plaintiff's medication regimen. A GAF score of 58 was assigned. (Tr. 366-70.)

Plaintiff returned to Dr. Rauchman on March 8, 2011, and complained of

intermittent ankle swelling, severe bilateral knee pain with intermittent swelling, stiffness in the lower back, and slight dysuria. Physical examination showed minimal tenderness with palpation about the knees, but was otherwise unremarkable with no edema or swelling. No flank tenderness was noted. Dr. Rauchman opined that plaintiff's arthritic symptoms could suggest spondyloarthropathy associated with IgA. X-rays were ordered and plaintiff was referred to Rheumatology. Otherwise, plaintiff's IgA nephropathy was considered to be stable. Plaintiff's hypertension was noted to be under reasonable control. Plaintiff was encouraged to increase his fluid intake. (Tr. 364.)

X-rays of the lumbosacral spine dated March 11, 2011, showed mild hypertrophic spurring at L4-L5. (Tr. 350-51.) X-rays of the left knee yielded negative results. (Tr. 350.)

On March 17, 2011, Dr. Denise R. Trowbridge, a medical consultant with disability determinations, completed a Physical RFC Assessment in which she opined that plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and was unlimited in his ability to push and/or pull. Dr. Trowbridge opined that plaintiff should never climb ladders, ropes, or scaffolds but could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Dr. Trowbridge further opined that

plaintiff had no manipulative, visual, or communicative limitations. Dr. Trowbridge further opined that plaintiff should avoid concentrated exposure to vibration and hazards. (Tr. 464-69.)

On March 22, 2011, Gretchen Brandhorst, Psy.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that plaintiff's depression was not a severe mental impairment. Dr. Brandhorst specifically opined that plaintiff experienced no limitations in activities of daily living or in maintaining concentration, persistence, or pace; mild limitations in maintaining social functioning; and no episodes of decompensation of extended duration. (Tr. 470-80.)

A CT scan of the abdomen dated March 31, 2011, showed no evidence of renal, ureteral calculi; no hydronephrosis; and no hydroureter. (Tr. 483-85.)

Plaintiff visited Dr. Hector Molina-Vicety, a rheumatologist, on April 14, 2011, for evaluation of ongoing low back pain that was tolerable at a level two out of ten, and increasing knee pain which he occasionally experienced at a level seven. Plaintiff reported a history of smoking for fifteen years and a history of drinking alcohol that he stopped in 1995. Physical examination showed mild discomfort upon pushing down on the patella bilaterally and moderate pain upon palpation of the medial joint line. Pain was noted about the ankles with palpation. Plaintiff also experienced pain upon palpation to the SI area with limited range of

motion due to stiffness. Straight leg raising was negative. Dr. Molina-Vicety noted examination and diagnostic studies to be essentially unremarkable. Additional laboratory and diagnostic testing was ordered, and plaintiff was referred to physical therapy for exercises and modalities for pain control. Plantar arches and knee braces were ordered, and plaintiff was instructed to take acetaminophen, apply analgesic cream, and try to lose weight. (Tr. 548-51.)

X-rays of the sacroiliac joints dated April 15, 2011, yielded negative results. (Tr. 483.)

Plaintiff visited Dr. Gaskin on April 25, 2011, and reported having a better mood and not being as irritable. Plaintiff reported that knee pain interfered with his sleep, and it was noted that plaintiff napped about four times a day for about an hour each time. Plaintiff denied suicidal thoughts but reported being down and thinking that he might be better off dead. Dr. Gaskin noted plaintiff to be irritable. Mental status examination was otherwise unremarkable. Dr. Gaskin continued plaintiff on his medication regimen and assigned a GAF score of 55. (Tr. 544-48.)

Plaintiff began physical therapy for left knee pain on June 6, 2011. Plaintiff reported that he must constantly move and cannot stand in one place, but that he experiences increased grinding and pain in the knee with prolonged walking. Plaintiff reported the pain to also interfere with his sleep. Plaintiff reported that wearing a knee brace and resting helped relieve his symptoms. Physical

examination showed limited range of motion about the left knee and poor hip abduction. Tenderness was noted about the left quad and left lateral femoral condyle. Slight increase of superficial patellar pain was noted with compression. Referred pain to the knee was noted with palpation of the vastus lateralis and rectus femoris. Plaintiff participated in physical therapy and was given instruction as to home exercises. He was further instructed to participate in therapy for eight weeks. (Tr. 514-17.)

Plaintiff visited Dr. Laura J. Kroupa for a general examination on June 7, 2011, and reported that treatment for kidney stones had helped his kidney pain but that he continued to have low back pain that worsened with exercise. Plaintiff reported taking Tylenol for the pain. Plaintiff also reported shortness of breath with exercise and heavy breathing in general. Plaintiff reported his diarrhea to be better with medication. Plaintiff was instructed to continue with his medications and to increase Tylenol. Plaintiff was also prescribed nicotine patches to help with smoking cessation. A referral for a chiropractic consult was made as well as a referral for pulmonary function tests. (Tr. 537-39.)

Plaintiff was discharged from physical therapy on July 1 with reports of improvement, less grinding of the knee, and less need for the brace. Plaintiff was instructed to continue with home exercises. (Tr. 534-37.)

Plaintiff returned to Dr. Molina-Vicety on July 14, 2011, who noted no

evidence of inflammatory arthritis. Dr. Molina-Vicety noted plaintiff to have responded "great" to physical therapy and analgesic cream, with good response also noted with knee bracing. Physical examination showed pain upon palpation to the lumbar area at L5-S1 with limited range of motion due to stiffness. Straight leg raising was negative. Dr. Molina-Vicety opined that plaintiff's pain was mechanical in nature due to his weight and previous history of playing football and basketball with injury to the left knee. Plaintiff was instructed to perform low back exercises and to continue to lose weight. Capsaicin cream was prescribed for the low back, and plaintiff was to continue with acetaminophen. (Tr. 531-33.)

In a letter addressed to "To whom it may concern" dated July 15, 2011, Dr. Molina-Vicety wrote that he was treating plaintiff for low back pain possibly related to mild hypertrophic spurring of the lumbar vertebra at L4-L5, consistent with early degenerative changes. Dr. Molina-Vicety further wrote that plaintiff "cannot stay in a sitting position for [a] prolonged period of time due to exacerbation of his pain. Please take this into consideration and accommodate . . . as needed to minimize discomfort related to his lower back condition." (Tr. 626.)

Plaintiff underwent pulmonary function testing on July 26, 2011, the results of which were essentially normal. (Tr. 508-11.)

On that same date, July 26, plaintiff returned to Dr. Rauchman who noted plaintiff's IgA nephropathy to be relatively stable and his hypertension to be under

reasonable control.  Dr. Rauchman noted plaintiff to have active kidney stone disease with passing of small stones.  Plaintiff was prescribed Allopurinol and his other medications were adjusted.  Plaintiff was instructed to lose weight and to increase his fluid intake.  (Tr. 531.)

Plaintiff visited Dr. Gaskin on August 11, 2011, and reported that he felt like a zombie.  Dr. Gaskin determined to decrease plaintiff's Abilify.  Plaintiff's current medications included Albuterol, Allopurinol, Aripiprazole, Atenolol, Bupropion, Capsaicin, Lisinopril, Loperamide, Omeprazole, Topiramate, and Venlafaxine.  Plaintiff reported no side effects.  Plaintiff reported having no migraines since taking Topamax.  It was noted that plaintiff had just returned from spending two weeks in Arizona.  Plaintiff had no thoughts of harming himself or others.  Mental status examination showed plaintiff to be depressed and irritable.  Plaintiff reported his sleep to be fair.  A GAF score of 55 was assigned.  (Tr. 526-30.)

On August 16, 2011, plaintiff visited Dr. Kroupa for general follow up examination.  Plaintiff reported having quit smoking about eight weeks prior but admitted to having half a cigarette a few days a week.  Plaintiff reported passing a lot of kidney stones and that back pain continued to be a problem.  Plaintiff reported that taking extra Tylenol did not provide relief.  Plaintiff's mother reported that plaintiff also experienced daytime somnolence, restless sleep, and extensive snoring.  Plaintiff was referred to the sleep clinic and was subsequently

issued a CPAP machine given his signs and symptoms of obstructive sleep apnea, including snoring, breathing cessation, and frequent awakening. (Tr. 524-26, 619-21.)

Plaintiff underwent a chiropractic consultation on September 2, 2011, for low back pain. Plaintiff described the pain to be sharp when he moves and to otherwise be a dull ache. Plaintiff reported that sitting causes the most pain but that he feels no pain when he walks. Plaintiff reported that he lies down to relieve the pain. Plaintiff reported not taking any medication for the pain because of his kidney disease and that stretching aggravates the pain. Plaintiff reported that he was previously employed as a repossession driver but that such work "did not require a lot from his low back." Examination showed tenderness and restriction about the right L1-2 and L3-4, and the SI bilaterally. Plaintiff's lumbar paraspinals and QL were noted to be tight bilaterally. Sensory and motor examinations were normal. Upon review of previous diagnostic studies, chiropractor Pamela J. Wakefield diagnosed plaintiff with low back pain with associated segmental dysfunction and hypertonic musculature complicated by mild degenerative changes. Chiropractic adjustments were made to the lumbar spine, pelvis, and lumbar paraspinals, and plaintiff reported feeling "very good" after treatment. (Tr. 500-05.) On September 16, plaintiff reported his pain to have worsened, especially with sitting. Tenderness and hypertonicity was noted about the thoracolumbar

erectors and quadratus lumborum. Chiropractic adjustments were made, and plaintiff reported feeling better. (Tr. 624-25.)

On September 27, 2011, plaintiff reported to Dr. Rauchman that he had started smoking again. No ankle edema or flank pain was noted, but plaintiff reported some intermittent hematuria. Dr. Rauchman adjusted plaintiff's medications. (Tr. 623-24.)

During a chiropractic visit on September 30, plaintiff reported that his stretching exercises helped him move more but did not help his pain. Tightness was noted about the lumbar muscles. Chiropractic adjustments were made, and plaintiff reported that he felt he was improving. (Tr. 621-23.) On October 7, plaintiff reported to Dr. Wakefield that he was doing much better with his care and home exercises. Plaintiff reported his pain to have greatly decreased and that he could sit for longer periods without pain. Dr. Wakefield noted plaintiff's range of motion to improve as well. Hypertonicity continued to be noted about the lumbar paraspinal musculature. Plaintiff reported being "very excited" in that he felt only a small amount of tension at the L3-4 level. (Tr. 618-19.) On October 21, plaintiff reported feeling "great" after his treatments. Low back pain was noted with lateral flexion of the lumbar spine, but plaintiff otherwise had full range of motion about the thoracic and lumbar spine. Plaintiff continued to exhibit hypertonic muscles. Additional adjustments were performed, and plaintiff was instructed as to

additional home exercises.  (Tr. 615-18.)

Plaintiff returned to Dr. Molina-Vicety on October 27, 2011, and reported

that his low back pain was alleviated by chiropractic manipulation but that he

continued to have constant kidney pain because of kidney stones.  Plaintiff also

reported his knee pain to have responded well to bracing.  Plaintiff reported being

achy in his ankles and knees with associated swelling in the feet after standing for

a long time.  Plaintiff reported that he was having problems with water excretion

despite increased fluid intake.  Physical examination showed pain upon palpation

of the L5-S1 area with limited range of motion because of stiffness.  Otherwise,

examination was unremarkable.  Dr. Molina-Vicety prescribed Flexeril for

plaintiff's chronic pain and instructed plaintiff to continue to lose weight and use

analgesic cream for his back.  (Tr. 612-14.)

Plaintiff returned for chiropractic care on November 4, 2011, and reported

feeling much better.  Plaintiff reported that he was "ready to be released

whenever."  Chiropractic adjustments were made and plaintiff reported feeling

"great."  Plaintiff was released from chiropractic care with instruction to obtain a

new consult if the pain returned.  (Tr. 610-12.)

Plaintiff visited Dr. Gaskin on November 21, 2011, and reported feeling

anxious.  Dr. Gaskin increased plaintiff's dosage of Abilify slightly.  Plaintiff

reported that his back was better with the muscle relaxant and that he felt he was

"on the right mix of meds[.]" Mental status examination was normal. Plaintiff was continued in the GAF score of 55. (Tr. 605-10.)

On the following day, November 22, plaintiff complained to Dr. Kroupa that he was having difficulty with the CPAP machine because of nasal congestion. Physical examination was unremarkable. Plaintiff was instructed to continue with his medications. (Tr. 603-05.)

A CT scan of the abdomen and pelvis dated December 21, 2011, yielded unremarkable results. (Tr. 557-58.)

On February 8, 2012, Dr. Molina-Vicety noted plaintiff's joint pain condition to be stable with only occasional mild pain in the lower back. Dr. Molina-Vicety noted plaintiff to be doing well with his current treatment regimen, which included physical therapy, muscle relaxant, and topical analgesic. No change was made. (Tr. 602-03.)

During an otolaryngology consult on February 27, 2012, plaintiff reported that he cannot tolerate the CPAP mask because of nasal congestion and feeling unable to breathe upon waking. Nasal examination was normal and no obstruction was noted. (Tr. 594-96.) Plaintiff reported to Dr. Kroupa the following day that he did not sleep well because of pain and his CPAP machine. Plaintiff reported being bored and depressed, and Dr. Kroupa discussed with him the cycle of pain/depression/sleep disturbance. Dr. Kroupa discussed the need to lose weight and to

stay active.  Dr. Kroupa determined to treat plaintiff's back pain.  (Tr. 591-92.)

Plaintiff also visited Dr. Rauchman on February 28 and reported that he was having some success with smoking cessation.  Plaintiff reported no current remarkable symptoms associated with his kidney disease.  Dr. Rauchman determined to maintain the current treatment regimen.  (Tr. 593-94.)

On March 1, 2012, plaintiff visited Dr. Gaskin and reported feeling better. Plaintiff reported that his mood had been okay and that he felt stable and was not depressed.  Dr. Gaskin noted plaintiff's mental status examination to be "better than anytime [he has] seen him."  Plaintiff expressed his belief that they had "the meds right[.]"  Plaintiff's medication list included a recent prescription for Tramadol.  Plaintiff reported being bored and expressed his desire to move to Arizona where he had friends.  Dr. Gaskin kept plaintiff on his current medication regimen and assigned a GAF score of 60.  (Tr. 584-90.)

Plaintiff underwent a sleep study on March 7, 2012, which showed plaintiff to have moderate obstructive sleep apnea.  Plaintiff was instructed to avoid supine sleep and to use his CPAP.  Plaintiff was also instructed to consider a weight loss program and an ENT consult.  (Tr. 583-84.)

On May 9, 2012, plaintiff reported poor sleep and fatigue to Dr. Kroupa. Plaintiff reported his pain to be stable but that taking Tramadol twice a day did not help that much.  Plaintiff's dosage of Tramadol was adjusted.  (Tr. 580-81.)

On June 8, 2012, Dr. Molina-Vicety noted plaintiff to be doing well on his current treatment regimen and no changes were made. (Tr. 579-80.)

Plaintiff returned to Dr. Gaskin on June 12 and reported that he continued to be okay. Dr. Gaskin continued plaintiff on his current medications. (Tr. 575-79.)

## IV. The ALJ's Decision

The ALJ found that plaintiff last met the insured status requirements of the Social Security Act on March 31, 2012. The ALJ found plaintiff not to have engaged in substantial gainful activity from September 17, 2010, through March 31, 2012, the date last insured. The ALJ found that, through March 31, 2012, plaintiff had the severe impairments of IgA nephropathy, nephrolisthiasis, obesity, hypertension, and depression, but did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that, through March 31, 2012, plaintiff had the RFC to perform medium work, lift fifty pounds occasionally, twenty-five pounds frequently, stand/walk six hours out of eight, and sit six hours out of eight. The ALJ further found that plaintiff could understand, remember, and carry out at least simple instructions and non-detailed tasks. The ALJ determined that, through March 31, 2012, plaintiff was unable to perform any of his past relevant work. Considering plaintiff's age, education, work experience, and RFC through March 31, 2012, the ALJ determined vocational expert testimony to

support a finding that plaintiff could perform other work as it exists in the national economy, and specifically, motor vehicle assembler, farm/grain worker, and trimmer. The ALJ thus found that plaintiff was not under a disability at any time from September 17, 2010, through March 31, 2012. (Tr. 16-28.)

## V. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner engages in a five-step sequential evaluation process in determining whether a claimant is disabled. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Step 1 considers whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. At

Step 2, the Commissioner decides whether the claimant has a "severe" medically determinable impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. If the impairment(s) is severe, the Commissioner then determines at Step 3 whether such impairment(s) is equivalent to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) meets or equals one of the listed impairments, he is conclusively disabled. Prior to Step 4, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step 4, the Commissioner establishes whether the claimant's impairment(s) prevents him from performing his past relevant work. If the claimant can perform such work, he is not disabled. Finally, if the claimant is unable to perform his past work, the Commissioner continues to Step 5 and evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. The claimant is entitled to disability benefits only if he is not able to perform other work.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the plaintiff's impairments.

6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

As noted above, plaintiff raises numerous claims arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. The Court will address each claim in turn.

A.    Credibility Analysis

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider

all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing her reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001); *see also Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez,* 403 F.3d at 957; *Pearsall*, 274 F.3d at 1218.

Here, the ALJ acknowledged and considered the *Polaski* factors in

discounting plaintiff's subjective complaints of disabling symptoms. *See Halverson v. Astrue,* 600 F.3d 922, 931-32 (8th Cir. 2010). In addition to noting that objective medical evidence did not support plaintiff's allegations of disabling symptoms during the relevant period, the ALJ also noted that plaintiff's medication record did not support his claim of severe pain or demonstrate that his hypertension was not controlled. *See id.* (ALJ's credibility determination may include consideration of absence of objective medical evidence to support complaints); *see also Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (impairments controllable by treatment or medication are not considered disabling); *Black v. Apfel*, 143 F.3d 383, 386-87 (8th Cir. 1998) (conservative course of treatment inconsistent with complaints of debilitating pain); *Richmond v. Shalala*, 23 F.3d 1441, 1443-44 (8th Cir. 1994) (lack of strong pain medication inconsistent with subjective complaints of disabling pain).

The ALJ also noted that no physician ever found or imposed any long term, significant physical or mental limitations on plaintiff. *See Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (credibility discounted where no physician imposed any work-related restrictions). To the extent Dr. Molina-Vicety opined in July 2011 that plaintiff was limited in his ability to sit for long periods of time, the ALJ properly discounted this opinion inasmuch as it was not supported by the record as a whole. Indeed, a review of the record *in toto* shows Dr. Molina-

Vicety to have acknowledged that plaintiff's pain was caused by a mild impairment and was successfully treated with physical therapy, bracing, and medication. Plaintiff himself determined that continued therapy and bracing was not necessary given his pain relief. *See Turpin,* 750 F.3d at 993; *Steed v. Astrue,* 524 F.3d 872, 875 (8th Cir. 2008) (diagnosis tempered by the words "mild" or "minimal"). Inconsistency with other evidence alone is a sufficient basis upon which to discount a treating physician's opinion. *Goff v. Barnhart,* 421 F.3d 785, 790-91 (8th Cir. 2005).

In addition, the ALJ noted that plaintiff testified that his back problem prevented him from being able to continue working as a repossession driver, but that such testimony was inconsistent with his report to his physician that the job did not require a lot from his low back. *See Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (inconsistency in claimant's statements valid reason to discredit subjective complaints). The ALJ also noted plaintiff's report to physicians that he had normal bowel habits to be inconsistent with claims to other physicians that he had a fifteen-year history of chronic diarrhea. Regardless, a review of the record shows plaintiff's diarrhea condition, whether chronic or more limited in duration, to have come under control with medication. *See Turpin,* 750 F.3d at 993.

To the extent plaintiff claims that the ALJ failed to consider his testimony that his medications caused significant side effects, a review of the record shows

that plaintiff made no complaints to any of his physicians about medication side effects. This inconsistency supports the ALJ's adverse credibility determination. *See Depover v. Barnhart*, 349 F.3d 563, 566 (8th Cir. 2003); *Richmond,* 23 F.3d at 1443-44 (plaintiff complained of medication side effects at hearing but medical record showed no reports of side effects to doctors). In addition, although plaintiff claims that the ALJ's credibility analysis failed to sufficiently address his need to lie down and nap throughout the day, a review of the ALJ's decision shows her to have considered plaintiff's claims of fatigue and exhaustion and found them to be inconsistent with the medical evidence that showed no evidence of such fatigue during examinations, including no evidence of loss of strength, cognitive dysfunction, or somnolence related to overwhelming fatigue. Although not all the evidence "pointed in that direction," there was a sufficient amount that did such that the ALJ's decision is supported by substantial evidence. *See Moad v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001). Nevertheless, while evidence of plaintiff's sleep apnea and reported claims of poor sleep may be consistent with debilitating symptoms, it cannot be said that the ALJ's credibility determination is unsupported in light of the other inconsistencies in the evidence and the objective medical evidence in the record as a whole. *Halverson*, 600 F.3d at 933.

Finally, plaintiff claims that the ALJ appeared to discredit his subjective complaints by improperly relying on his past alcohol use without explaining how

such prior use was relevant to the credibility determination. A review of the ALJ's decision, however, shows her to have found plaintiff not to be entirely credible because of his inconsistent statements regarding his history of alcohol use and not on account of the alcohol use itself. Indeed, plaintiff's statement to one provider denying that he ever drank to excess directly contradicts other statements to providers that he previously drank heavily and, in fact, up to a fifth of alcohol and a case of beer daily. Inconsistency in a claimant's statements is a sufficient factor to consider in determining credibility. *Ply*, 251 F.3d at 779.

Accordingly, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from his credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. *Renstrom,* 680 F.3d at 1065; *Goff,* 421 F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

B.      RFC Assessment

Plaintiff claims that the ALJ's improper evaluation of the evidence resulted in her failure to include sufficient limitations in the RFC as to sitting, standing, walking, lying down/napping, and social interaction. For the following reasons, the ALJ did not err in the manner by which she assessed plaintiff's RFC.

A claimant's RFC is what he can do despite his limitations. *Dunahoo,* 241 F.3d at 1039. The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. *Goff,* 421 F.3d at 793; *Eichelberger,* 390 F.3d at 591; 20 C.F.R. § 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the record must contain medical evidence sufficient to determine the claimant's RFC at the time of the hearing. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). While the responsibility for determining RFC rests with the ALJ, the claimant nevertheless retains the burden to prove his RFC. *Eichelberger*, 390 F.3d at 591; *Baldwin,* 349 F.3d 549, 556 (8th Cir. 2003); *Pearsall*, 274 F.3d at 1217-18. An ALJ's RFC assessment must be based on credible evidence of record. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011).

Here, the ALJ thoroughly discussed the medical evidence of record, including the diagnostic and clinical examinations that showed plaintiff's impairments and their effect on his ability to function, and specifically, that plaintiff's obesity caused some mild degenerative issues that were effectively

managed by various treatment modalities; chronic kidney disease and hypertension likewise managed by medication; and depression that improved with medication and did not cause plaintiff to exhibit anything other than essentially normal behaviors during mental status examinations. In evaluating the medical evidence, the ALJ accorded significant weight to the treatment records of plaintiff's treating physicians, including Dr. Molina-Vicety, and properly discounted Dr. Molina-Vicety's July 2011 opinion for the reasons stated *supra* at pp. 31-32.

The ALJ also discussed the nonmedical evidence of record. She specifically noted plaintiff's past work, the circumstances giving rise to his claimed inability to work, and his current daily activities. In addition, as discussed at length *supra,* the ALJ thoroughly analyzed plaintiff's subjective complaints and the consistency of such complaints with other evidence of record.

Upon conclusion of her discussion of specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's RFC based on the relevant, credible evidence and set out plaintiff's limitations and their effect on his ability to perform work-related activities. *See* Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (Soc. Sec. Admin. July 2, 1996). To the extent plaintiff argues that the ALJ should have included in the RFC his need to lie down or nap during the day because of fatigue, back pain, and medication side effects; and his need to be near a bathroom

because of chronic diarrhea, the ALJ properly determined these subjective limitations as testified by plaintiff not to be fully credible.  *See* discussion, *supra* at Sec. V.A.  The ALJ therefore did not err in failing to include these limitations in the RFC assessment.  *See McCoy,* 648 F.3d at 614; *Tellez*, 403 F.3d at 957.

Nor did the ALJ err by failing to include additional limitations relating to plaintiff's level of social interaction.  Plaintiff claims that evidence of his irritability is demonstrated in the record by Dr. Gaskin's repeated observations of irritability and depression with mental status examinations, and that "[e]ven the non-examining reviewer noted evidence of difficulty with social interaction." (Pltf.'s Brief, Doc. #13 at p. 9 (citing Tr. 480).)  A review of the record *in toto*, however, fails to show these limited observations to be of such a degree that plaintiff's ability to engage in work-related functions was affected thereby.

Between July 2010 and August 2011, mental status examinations conducted by Dr. Gaskin repeatedly showed plaintiff to be irritable.  Throughout this period, Dr. Gaskin prescribed psychotropic medications and made adjustments thereto based on plaintiff's response, from which plaintiff enjoyed some improvement. With continued adjustments, plaintiff no longer demonstrated irritability after August 2011, and mental status examinations thereafter were normal in all respects.  Indeed, plaintiff reported feeling stable and no longer depressed and attributed his improvement to the right mix of medications.  An impairment that is

controllable or amenable to treatment does not support a finding of disability. *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009).

To the extent plaintiff relies on the State agency non-examining reviewer's assessment to support his argument that his RFC is affected by social limitations, such reliance is misplaced. A reading of the reviewer's notes referenced by plaintiff shows her to have merely recited plaintiff's subjective claims of social difficulties that he made in his Function Report and to have found these claims to be inconsistent with the record inasmuch as plaintiff did not report such limiting circumstances to his treating physicians. (Tr. 480.) In addition, to the extent the reviewer opined that plaintiff had "mild" limitations in social interaction (*see* Tr. 478), the undersigned notes that a finding of only mild limitations in the broad areas of functioning generally leads to a conclusion that the impairment is not severe. *See* 20 C.F.R. § 404.1520a(d)(1).[4] Nevertheless, the reviewer's opinion was rendered in March 2011 and, as noted by the ALJ, was made without the benefit of subsequent medical evidence, which, as described above, showed plaintiff's mental impairment to be controlled with medication such that plaintiff was stable and exhibited no abnormal behavior, including irritability.

Finally, without specific discussion or argument, plaintiff contends that the

---

[4] As noted earlier, the reviewer opined that plaintiff experienced no or mild limitations in all broad areas of functioning. (*See supra* at p. 15.)

ALJ should have included additional limitations in sitting, standing, and walking. As noted by the ALJ, however, a review of the record shows plaintiff to have reported to Dr. Molina-Vicety in April 2011 that his back pain was tolerable and that the onset of his knee pain was recent. After beginning treatment for such pain, which included medication and referrals to physical therapy and chiropractic care, plaintiff was reporting by September 2011 that he experienced no pain with walking and by October 2011 that his pain had been greatly reduced to such an extent that he could sit for longer periods of time. Dr. Molina-Vicety noted thereafter that plaintiff was doing well, had only occasional mild pain, and required no change in his treatment regimen. To the extent plaintiff may claim additional limitations in sitting, standing, and walking because of fatigue, the ALJ properly discounted plaintiff's complaints of debilitating fatigue and a review of the record shows plaintiff not to have reported to any physician that fatigue limited his ability to engage in these activities. The ALJ therefore did not err in failing to include additional limitations in sitting, standing, or walking in her RFC assessment. Plaintiff presents no other credible evidence demonstrating that he is more restricted than as determined by the ALJ. An ALJ is not required to list and reject every possible limitation. *McCoy,* 648 F.3d at 615.

The ALJ properly established plaintiff's RFC based upon all the record evidence in this case, including medical and testimonial evidence. Because the

record contains some medical evidence that supports the RFC and substantial

evidence on the record as a whole supports the determination, the ALJ did not err.

*Baldwin*, 349 F.3d at 558; *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000)

(per curiam).

C.    Vocational Expert Testimony

To the extent plaintiff claims that the ALJ erred by relying on vocational

expert testimony given in response to a hypothetical question that failed to include

additional limitations as to sitting, standing, walking, lying down, and napping,

such additional limitations were not warranted by the record, as discussed *supra*.

The ALJ therefore did not err by failing to include these additional limitations in

the hypothetical question posed to the expert.

Plaintiff also claims, however, that the hypothetical question failed to

include limitations as found by the ALJ in her written decision and thus that the

ALJ erred in relying on the expert's response to this incomplete hypothetical to

find plaintiff not disabled.  In her written decision, the ALJ found plaintiff to have

the RFC to "understand, remember and carry out at least simple instructions and

non-detailed tasks." (Tr. 19.)  The hypothetical posed to the vocational expert,

however, included only a limitation to "unskilled" work and did not include the

specific limitations as articulated by the ALJ in her written decision.  (Tr. 50.)  In

the circumstances of this case, this claimed error was harmless.

As noted by the Commissioner in her Brief, the Social Security Administration defines "unskilled work" as having the abilities "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  SSR 85-15, 1985 WL 56857, at *4 (Soc. Sec. Admin. 1985).  The ALJ's written RFC assessment here limiting plaintiff to understanding, carrying out, and remembering simple instructions does not impose limitations more restrictive than "unskilled work" as defined by the Social Security Administration in this Ruling.  To the extent the ALJ's written RFC assessment includes an additional limitation to the performance of non-detailed tasks, the undersigned notes that the vocational expert testified, and the ALJ found, that plaintiff could perform work as a farm/grain worker as described in the *Dictionary of Occupational Titles* (DOT) at number 401.687-010.  (Tr. 27, 51.)  Such work involves no detailed tasks but instead requires the ability to apply "commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from [] situations encountered on the job."  DOT 401.687-010, 1991 WL 673292.  As such, this work fits within the definition of unskilled work and complies with the additional limitation of non-detailed tasks.  The vocational expert testified that 790 such jobs exist in the State of Missouri and 233,280 nationally.  (Tr. 51.)  Because there is a

significant number of farm/grain worker jobs that plaintiff is capable of performing with the RFC as determined by the ALJ in her written decision, the ALJ did not err in finding plaintiff able to perform this other work as it exists in significant numbers in the national economy. 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet[.]"); *Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (vocational expert's testimony that 32,000 positions existed nationwide in occupation that could be performed by person with claimant's vocational factors and RFC constituted substantial evidence that a significant number of jobs existed in the economy that claimant could perform).

Accordingly, to the extent there existed semantic discrepancies between the ALJ's written RFC and the hypothetical question posed to the vocational expert, such discrepancies resulted in no more than harmless error and do not require remand inasmuch as they had no effect on the outcome of the case. *See Byes v. Astrue*, 687 F.3d 913, 918 (8th Cir. 2012) (case would not have been decided differently in the absence of ALJ's claimed error in determining claimant's RFC); *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (declining to remand for alleged error in opinion when error "had no bearing on the outcome") (internal quotation marks omitted).

## VI. Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Id.* Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Id.*; *see also Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

For the reasons set out above on the claims raised by plaintiff on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that plaintiff was not disabled from September 17, 2010, through March 31, 2012. Because substantial evidence on the record as a whole supports the ALJ's decision, it must be affirmed. *Davis,* 239 F.3d at 966. This Court may not reverse the decision merely because substantial evidence exists that may support a contrary outcome. Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

 /s/ Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of January, 2015.